## Geddes's Appeal.

1. Nothing but fraud or palpable mistake is ground for rescinding an executed contract.

2. A partner sold his interest in the firm to his fellows ; in a proceeding about six years afterwards, to rescind the sale, he alleged that his interest had been represented by one of them as being of less value than it was : *Held*, that as partner he had a right to examine the books, &c., and not having availed himself of the means of information he had no ground for relief.

3. Partners bought the interest of a fellow, through a third person, concealing that the purchase was for them. *Held*, that was not *per se* fraudulent.

4. The proof of fraud must be clear and satisfactory to induce a court after a considerable time to avoid a contract deliberately made and fully executed.

5. Evidence of fraud in this case insufficient to avoid a contract between partners.

January 28th 1876. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

. Appeal from the Court of Common Pleas of *Union county :* In Equity : Of January Term 1875, No. 121.

On the 30th of March 1870, Samuel Geddes filed a bill against James S. Marsh, Peter Beaver, Levi Rooke and Thomas Beaver ; the bill sets out :—

1. On the 6th of April 1854, the plaintiff, with James S. Marsh, Frederick Marsh (since deceased) and Joseph W. Shriner, trading as Geddes, Marsh & Co., owned Union Furnace, its stock, &c. ; also ore leases, &c., personal property, book accounts, &c.

2. On that day, by articles of agreement, the firm admitted into partnership Thomas Beaver, Peter Beaver and Charles E. Morris, and on the 21st of December 1855, by other articles, they admitted Levi Rooke ; Morris and Rooke were to manage the business, and make up the accounts every year to December 31.

3. On the 1st day of April 1864, James S. Marsh, Peter Beaver and Levi Rooke had become the owners of three-fourths of

the whole, and plaintiff and Shriner were the owners of the remaining one-fourth or one-eighth each.

4. The said Furnace was under the entire management and control of Marsh, Beaver and Rooke, who were in possession of the books and accounts. Plaintiff never received or took any thing out of the firm, nor was there ever any account made up and shown to him of its condition, although it had been frequently asked for and demanded, but that he was led to believe by the assertion of his co-partners, or some of them, and especially by a letter, dated 11th February 1864, written by Rooke, that no profits had been realized by the firm, and that it was not worth the original investment and the interest.

5. A short time before the 1st of April 1864, Marsh, Beaver & Rooke proposed to plaintiff and Shriner, through a certain Jonathan Wolfe, that as they were unable to purchase the estates of plaintiff and Shriner in the furnace, and were very anxious that Thomas Beaver, who had previously sold his interest, should again become a member, and that he desired to become a member of the firm again, and that they would procure him to purchase the estates and interests of plaintiff and Shriner, and informed them through the same person that their estates and interest were jointly worth about $23,000. Relying upon that information and the letter of Rooke, the plaintiff and Shriner did sell and convey their estates and interests to Thomas Beaver jointly, for the sum of $26,000 or thereabout, by their deed, dated April 1st 1864.

6. Since the sale he had discovered that the furnace was, on the 1st day of April 1864, in a prosperous condition, and making large profits; that it had made before that time about $100,000, the amount originally invested in the same, which was profit, and that the real estate and fixtures had greatly enhanced in value, all of which was unknown to and concealed from plaintiff before the sale, but which would appear when the books and accounts of the firm were produced. The statements of the value of his estate and interest in the firm, made to him through Wolfe, by the defendants, or some of them, as well as the statement contained in the letter of Rooke, were false and fraudulent, and made for the purpose of inducing him to sell his estate and interest in the firm for less than it was really worth; Thomas Beaver did not purchase for himself, but he was interposed to purchase for James S. Marsh, Peter Beaver and Levi Rooke, and, after the purchase, Thomas Beaver actually did convey and transfer it to them. Defendants, at the time of said sale, well knew that the estates and interests were worth more than about $26,000, and for that reason they, or some of them, paid or agreed to pay the estate of Frederick Marsh, deceased, the sum of about $10,000 over and above the amount paid plaintiff, although the interest of the estate of Frederick Marsh, deceased, was no greater than plaintiff's.

[Geddes's Appeal.]

7. At the time the sale was about to be consummated, Shriner hesitated and refused to sign the deed of conveyance for fear that he might be prejudiced thereby, and in order to induce him to do so, Thomas Beaver secretly agreed to give him $2000 in addition to the price agreed upon, which was inserted in the deed as the consideration, and further requested Shriner to say nothing to plaintiff about this additional $2000; and Peter Beaver, in pursuance of the agreement, paid Shriner $1800, by means of which Shriner was induced to sign the deed and prevented from communicating fully and freely in regard to the sale with the plaintiff.

8. Since the sale to Thomas Beaver, James S. Marsh, in a conversation with others, declared that he, Peter Beaver and Levi Rooke made $90,000 by their purchase from plaintiff and Shriner; and that they had bought the interest of plaintiff and Shriner with the money of plaintiff and Shriner, and during the negotiation for the purchase Peter Beaver, Thomas Beaver, James S. Marsh and Levi Rooke, or some or one of them, promised John K. Kremer, the bookkeeper of the firm, to allow him an interest in the furnace if he would conceal from plaintiff the value of his estate in the furnace; in pursuance thereof Kremer neglected or refused to make out a balance sheet showing the value of the interest, and after the purchase was effected they refused to give Kremer an interest in the furnace, but gave him $1000 in lieu thereof.

9. Thomas Beaver is a necessary party to this bill, in order to entitle plaintiff to the relief hereinafter prayed for.

The prayers were:—

That the deed executed to Beaver might be declared fraudulent and void as an absolute conveyance, and decreed to stand as security for such amount, if any, as might upon an account be found due to the defendants; for an account, and for further relief.

The defendants answered:—

2. They denied that Thomas Beaver and Peter Beaver were taken in as partners on the 6th of April 1854, but they owned one-half of the furnace property and fixtures on the 22d of October 1853. On the 6th of April 1854, Charles E. Morris was taken into the concern, he having purchased an interest from Thomas Beaver and Peter Beaver. Levi Rooke was admitted as a partner on the 21st of December 1855, having purchased an interest from Thomas Beaver and Peter Beaver. Morris and Rooke, under the agreement of 21st of December 1855, were "to give their attention to the business of the firm in all its details (including the blowing of the furnace)." The company during all the time had a bookkeeper employed to take charge of the books and accounts, which were open to inspection of all the partners.

The plaintiff's share would have been one-tenth and one-half of a tenth.

3. On the 1st of April 1864, James S. Marsh, Peter Beaver and Levi Rooke owned all the furnace and property thereto attached, except that the plaintiff owned one-tenth and one-half of a tenth, and Shriner one-tenth, and Frederick Marsh's estate one-tenth.

4. They denied that the furnace was under the entire management and control of Marsh, Beaver and Rooke. The books were kept in the office, to which all persons interested in the firm could have access and examine the condition of the accounts and business done by the furnace. They denied plaintiff's allegation that he never received or took anything out of the concern; on the contrary, he took out $2466.03 up until January 1st 1864, and the firm of Geddes, Marsh & Co. (of which plaintiff was a member to the extent of one-fifth), received from the Furnace company and used pig iron to the amount of $79,077.33, which is charged in the furnace books against Geddes, Marsh & Co. Defendants denied that any account or statement was asked from them, or either of them, and refused. The books and papers connected with the Furnace company were always open for inspection and examination by any of the firm. None of the defendants except Rooke knew anything about his letter of February 11th 1864. He was not aware of any mis-statement or false representation contained therein, but stated in the letter what he then believed to be correct.

5. They denied this paragraph.

6. What the furnace was earning on the 1st of April 1864 was as well known to plaintiff as defendants. Defendants denied that the furnace made $100,000, or anything like that sum, up to April 1864. The real estate and fixtures, on or about the 1st of April 1864, would not have sold for more than one-half their cost. There was no concealment by defendants, or either of them, of the value of the property or accounts from plaintiff. Defendants denied that they, or either of them, made, or caused to be made, any false statements in regard to the furnace property or income. Thomas Beaver purchased the interest of plaintiff and Shriner, and agreed to convey the same to Peter Beaver, Rooke and James S. Marsh, upon certain conditions contained in a statement dated April 2d 1864. The whole transaction was fair and bonâ fide. Defendants denied that they knew the interest of Geddes & Shriner to be worth more than $26,000. There was no agreement, at the time of the purchase of the interest of Geddes and Shriner, to purchase the interest of Frederick Marsh's estate at any price; that interest was not purchased until considerable time afterwards, the conditions which will appear by article of agreement, dated June 1864. James S. Marsh states that the plaintiff expressly required that

James S. Marsh should take the interest of Frederick Marsh and charge it to his (James S. Marsh's) private account. Defendants expressly deny all fraud and misrepresentations charged in this paragraph.

7. They had no recollection of hesitancy on the part of Shriner to sign the deed, or any inducement held out for him to induce him to execute it. James S. Marsh stated 'that Shriner offered him $500 if he would get Thomas Beaver to pay him some $2000 more than Samuel Geddes got, as he had done more in the concern and spent more time than Geddes. Marsh advised Shriner not to sell, stating to him that he believed from indications that the future prospects of the furnace making money appeared favorable. Shriner insisted upon selling; and then Marsh went to see Thomas Beaver, and by explaining the circumstances in regard to services performed by Shriner, induced him to pay Shriner about $2000 more. Marsh declined taking the $500 offered him by Shriner. The whole arrangement about the $2000 was at the instance and request of Shriner. Neither Thomas Beaver nor Peter Beaver, nor any of the defendants, were indebted to plaintiff for any part of the $2000.

8, 9. They denied these paragraphs.

The following documents were exhibits to the bill and answer:—

Agreement of April 6th 1854, by which Geddes, Marsh & Co., of the first part, Thomas Beaver of the second part, Peter Beaver of the third part, and Charles E. Morris of the fourth part, entered into partnership in manufacturing iron, &c., under the name of Beaver, Geddes, Marsh & Co., the capital to be $60,000, and the interests in the firm to be: Geddes, Marsh & Co., one-half; Thomas Beaver, one-fourth; Peter Beaver, one-twelfth; Charles E. Morris, one-sixth; the capital to remain invested until it amounted to $100,000, before any of the partners should be at liberty to withdraw any of the capital invested by him; each partner to receive 6 per cent. interest on the amount invested by him, or on the amount standing to his credit at the close of each year, the accounts to be made up to that time, annually. Morris to withdraw from the capital for the support of himself and family, $1000 annually, to be charged to his account; he to be provided with house, &c.; he agreeing to give his personal attention to the books of account and business of the firm.

Provision was made by the agreement that no partner should use the firm name for any purpose not pertaining to its business; also for a contingent fund; the partnership to continue until June 1st 1859, and the interest of a partner dying to continue till the end of the term.

Agreement dated December 21st 1855—by which after the 1st of January 1856—Dr. Levi Rooke was admitted into the firm, and the net profit or loss was to be divided thus: Geddes, Marsh & Co., 50 per cent., Thomas Beaver, 20 per cent., Peter Beaver, 15

[Geddes's Appeal.]

per cent., Charles E. Morris, 10 per cent., Levi Rooke, 5 per cent., the capital and profits to remain invested until they should amount to $100,000, before any partner could withdraw any of his capital; the accounts to be made up annually on the 31st of December; the partnership to continue until December 31st 1858. Morris and Rooke to reside at the furnace and give their exclusive personal attention to the business of the firm in all its details, including blowing the furnace; to be provided with houses, fuel, &c. Morris to have also a salary of $500 per annum, and Rooke a salary of $700; the original agreement, except as altered by this, to remain.

Attached to this was a statement that from January 1st 1863, the claims of the partners should be represented as follows: James S. Marsh, $13,000; Peter Beaver, $13,000; Levi Rooke, $13,000; Samuel Geddes, $9000; J. W. Shriner, $6000; Frederick Marsh, deceased, $6000.

Letter to Geddes from Rooke was dated February 11th 1864, and was as follows:—

" * * * I am sorry I cannot furnish you at present with a balance sheet of our business here. John K. Kremer took sick before the books were closed, and has not been able to be out of the house for a week past; Joseph Shriner asked me a few days ago if we had a balance sheet made out. I told him no, but would let him see any time in a few minutes, if he came down when John was able to be about. We looked it over last week and concluded that this is about the way our business would stand the 1st of April next in round mumbers."

Then followed a statement in items showing the debts to be $63,600 and the credits $58,200.

"The furnace cost, per bill filed, including the new hot blast made but not up, $104,000; and all the partners have invested at this time amount to $105,000, including interest compounded; $52,000 of it is interest. Your investment, including Joseph Shriner's, is a little over $30,000. This is nearly correct. I think there may be a thousand dollars or so one way or the other. As soon as John gets better, come down and look it over yourself; this sickness will put him back so much that he will not be able to get a balance sheet out for some time yet."

After the purchase by Thomas Beaver of the interest of plaintiff and Shriner, Beaver made the following "memorandum" (A.):—

"It is understood that the purchase by me of Geddes & Shriner's interest in Union Furnace, and the claim of Geddes, Marsh & Co., as per annexed memorandum, is for the use of P. Beaver, to be divided by him between J. S. Marsh, Levi Rooke and him-

[Geddes's Appeal.]

self, at some future time, in such proportion as he may deem advisable. He agrees to pay the notes given by me, and payable to my own order at the Bank of Danville, as follows, all dated April 1st:— * * *

" The cash payment of ten thousand dollars was made by me with funds received from Waterman & Beaver. $8300 on accout of pig metal sold them and to be delivered, and $1700 received this day in cash from Peter Beaver; said $1700 being Cr. on books of W. & B. to Beaver & Co., and the whole sum of ten thousand charged to them by W. & B.

THOMAS BEAVER."

" The sum of $1972.27 charged to Thomas Beaver is also to be credited to me on the transfer of the above interest; it being the amount paid J. W. Shriner in excess of the above sum for his share in interest.        T. B."

The following (B.) is an agreement connected with the purchase:—

"April 2d 1864.

It is hereby agreed and understood that the following entries are to be made on the books of Beaver, Geddes, Marsh & Co., for the purpose of extinguishing the claim due Geddes, Marsh & Co.; the one-half of which has been this day purchased from Samuel Geddes and J. W. Shriner by Thomas Beaver, as per deeds of conveyance; the remaining half it is agreed shall be credited to account of J. S. Marsh.

"April 2d 1864.

Geddes, Marsh & Co., Dr.—To Sundries:
Thomas Beaver for this sum,        $33,833.37

Being the one-half of the amount due Geddes, Marsh & Co., April 1st 1864—the same having been purchased by Thomas Beaver from Samuel Geddes and J. W. Shriner.
James S. Marsh for this sum,        $33,833.37

Being the remaining half of Geddes, Marsh & Co.'s claim in above.

Thomas Beaver Dr.—To Sundries:
Samuel Geddes,        $2503.03

For this sum being the amount of his account made up to April 1st 1864, and now assumed by Thomas Beaver in the purchase of Geddes' interest in the firm of Beaver, Geddes, Marsh & Co.
Joseph W. Shriner for this sum,        $272.48

Assumed by Thomas Beaver as above.

SAMUEL GEDDES,<br>
THOMAS BEAVER,<br>
PETER BEAVER,<br>
J. W. SHRINER,<br>
JAMES S. MARSH,<br>
LEVI ROOKE."

[Geddes's Appeal.]

There was also an agreement made in June 1864, between James S. Marsh, Peter Beaver and Rooke, by which Marsh bound himself to procure for the firm of Beaver, Marsh & Co. the interest of Frederick Marsh, deceased, and this interest when procured to be equally divided between Peter Beaver, J. S. Marsh and Rooke, being members of the firm of Beaver, Marsh & Co.; that firm to pay to J. S. Marsh the principal with interest up to the day that the interest should be made over to them; also, to pay Marsh $10,000 and interest; Rooke and P. Beaver to have five years to pay the above sum and accept Frederick's interest, with privilege of refusal to take it within five years; in case of refusal, Frederick's interest to remain as now, and be entitled to all the profits as any other member of the firm; and, in consideration of the above agreement, P. Beaver bound himself to procure a title to the interest now in T. Beaver's hands, which he purchased from Shriner and Geddes, and this he was to divide equally between the firm of Beaver, Marsh & Co.

A replication was filed, and Alfred Hayes, Esq., was appointed examiner and master.

There was a great mass of testimony taken by him as examiner. As master he found as follows:—

"The business, out of which this controversy arose, commenced in 1853, by the erection of Union Furnace by Geddes, Marsh & Co., then composed of Samuel Geddes, James S. Marsh, Joseph Shriner and Frederick Marsh. ⟨ Subsequently, in the same year, Thomas Beaver and Peter Beaver became partners in the firm. On the 1st of January 1856 Charles E. Morris and Levi Rooke became partners. The respective interests then were as follows, viz.: Geddes, Marsh & Co., fifty per cent; Thomas Beaver, twenty per cent.; Peter Beaver, fifteen per cent.; C. E. Morris, ten per cent.; L. Rooke, five per cent. In January 1863, Thomas Beaver sold his interest, then amounting to $20,000, to Peter Beaver, for $13,000. This interest of Thomas Beaver was taken by Peter Beaver, J. S. Marsh and Rooke, Morris having disposed of his interest in 1858. The firm of Beaver, Geddes, Marsh & Co., on the 1st of January 1863, consisted of Peter Beaver, representing $13,000, being five-twentieths; J. S. Marsh, $13,000, being five-twentieths; Levi Rooke, $13,000, being five-twentieths; S. Geddes, $9000, being three-twentieths; J. W. Shriner, $6000, being two-twentieths; Frederick Marsh's estate—he being then dead—$6000, being two-twentieths, aggregating $60,000 capital. This so continued until April 1st 1864. The business was carried on under the agreement of 1854 as modified by that of 1855. When Morris left, his duties devolved on Rooke. He had charge of the money and teams, but the bookkeeper was never particularly under the charge either of him or Morris. Rooke was the only partner who lived at the furnace; the others lived at a distance of about four

30 P. F. SMITH—29

miles from it. Peter Beaver appeared to have acted as the financier of the firm, although such duty was not imposed on him. The furnace was not under the control of any of the partners to the exclusion of the others : all had access to the books and could get information from the bookkeeper, John K. Kremer."

The master estimated the assets of the firm, January 1st 1864, at $195,400 ; the liabilities, including the investments of the partners, at $177,666.86.

The investments of the partners were, Peter Beaver, $23,038.55 ; Geddes, Marsh & Co., $63,394.47 ; J. S. Marsh, $2179.62 : Levi Rooke, $11,580.06.

"Prior to this period the Furnace company had not been suc- cessful. From some time in 1859 till 1863 they were not able to control their finances. Thomas Beaver, who was interested in the furnace almost from the period of its inception, went out of the concern in April 1863, and states that it was not making money up to that date. The fact of his selling his interest at all, and especially his parting with it for fifty cents on the dollar, indicates that he did not consider the business a paying one. Samuel Geddes also, some four or five years prior to his selling his interest, was desirous of so doing, and had proposed to Jonathan Wolfe to endeavor to effect a sale of the same.

The price of iron had been low and its manufacture unprofit- able, but during the year 1863 the price advanced and the pros- pects brightened. During that year some money was made, and during the first three months of 1864 the sum of $16,449.67 was made by the furnace, and in the same year, after the purchase of the Geddes and Shriner interests, the price of iron continued to advance so much, that no additional capital was called in from the remaining partners to pay the purchase-money of the interests so bought.

"Thus we find that during the year 1864 the furnace made money very fast. During the next year, 1865, it is stated that the price of iron ran down below cost, and that nothing was made. * * * Wolfe endeavored to sell the interest (of Geddes), and with that view spoke to Peter Beaver and tried to effect the sale, but as Beaver uniformly declined purchasing, Wolfe at length abandoned any hope of selling for Geddes, and the matter was dropped. Several months prior to the 1st of April 1864, most probably about the last of January or first of February, * * * Peter Beaver called upon Jonathan Wolfe and stated that they would purchase the Geddes and Shriner interests in Union Furnace, provided they could be had at a low price, but that they did not desire this for themselves, but for Thomas Beaver; that they felt that it was greatly to their interest   that Thomas Beaver should have an interest in the furnace, in view of their getting their coal at a greater advantage, and also in disposing of their iron.

" The price first offered by Peter Beaver was in the neighborhood of $23,000, and he stated, in general terms to Mr. Wolfe, that their interests were not worth much more, and that they could not afford to give more. Before going to see Mr. Wolfe, Peter Beaver had talked the matter over with some of his partners. He states that it is altogether likely he had a conversation with Dr. Rooke and James S. Marsh, and has a positive recollection that he and Dr. Rooke had talked together in the office at the furnace as to what they would agree to give for the interests of Geddes and Shriner. On the 1st of March 1864, there was a conversation in the office at the furnace, and the amount of $26,000 was fixed as that which they would be willing to give for these interests. At that time and place there were present Peter Beaver, Dr. Levi Rooke and the bookkeeper. The matter was also talked over with Thomas Beaver. He states that he purchased at his brother Peter's request, and says that he has no doubt but that James S. Marsh, Dr. Rooke and his brother Peter were present with him at times when negotiations were entered into, * * * and with this interview negotiations commenced, which finally terminated in the sale of the Geddes and Shriner interests. There is nothing to indicate that either Mr. Geddes or Mr. Shriner knew that they were selling to their co-partners, but the whole testimony goes to show that they thought they were dealing exclusively with Thomas Beaver. The price first offered was in the neighborhood of $23,000. This was not agreed to by Mr. Geddes, who wanted more, and named, as Mr. Wolfe states, some $26,000 or $28,000. After considerable negotiation, the interests were conveyed to Thomas Beaver for the consideration named in the deeds, amounting to $25,775.51, which sum included Mr. Geddes's store bill at the furnace of $2503.03, and the store bill of Mr. Shriner, amounting to $272.48. Besides this amount, there was paid to Joseph W. Shriner, privately, an extra $2000 ; the aggregate amount thus paid for the interest being $27,775.51. Mr. Geddes considered the interest as worth all he asked for it, which was some thousand of dollars above what Mr. Beaver offered. Upon being advised by Mr. Wolfe not to sell unless he got his price, he stated that he would not sell if it were not for the unpleasant relations that existed between himself and the other members of the firm, and that the iron business was looking up at this time, and afforded him an opportunity of becoming disconnected in business from the other members of the firm, and if he should fail in accomplishing this object at this time, there might not another opportunity arise soon to sell. Mr. Geddes insisted also in Mr. Shriner's interest being sold with his. The reason for this was, that all the funds in Union Furnace under the name of Geddes, Marsh & Co., belonged to Geddes & Marsh, and that as Joseph W. Shriner owed the foundry company of Geddes & Marsh, by the sale of his inter-

[*Geddes's Appeal.*]

est in the furnace, this debt would be cancelled, and Mr. Geddes would get the money arising from the sale. This would come to Mr. Geddes, for the latter also insisted that the interest of Frederick Marsh, deceased, which was exactly equal to that of Mr. Shriner, and who was equally indebted to Geddes & Marsh, should be taken by James S. Marsh, and thus the latter would be assuming Frederick Marsh's indebtedness. This contemplated sale was not favorably looked upon by Mr. Shriner, who stated to Mr. Wolfe that they had run the furnace when it was a dragging business, and now when it was making money, he did not feel like being put out of it.

" While the subject of the sale was agitated Mr. Geddes and Mr. Shriner were anxious to know how matters stood at the furnace. Mr. Shriner went down several times and asked for a balance sheet. * * *· This he did not get, as it was stated that they were too busy, and also that the sickness of the bookkeeper prevented the making of one out. Mr. Shriner was in the habit of going to the furnace, from time to time, as long as he was interested in it, and he appears to have asked repeatedly for a 'balance sheet.' Mr. Geddes did not visit the furnace during several years prior to the sale, the principal reason being the fact of unpleasant relations existing between him and some of his co-partners. He did not go down to the furnace pending these negotiations. He gives as ·his reasons why any examinations of the books were omitted that they were kept by double entry, which he did not understand ; also, that he expected a yearly balance sheet, and further, the unpleasant relations above referred to. Dr. Rooke resided at and was the principal man attending to the furnace, and with him, as also with the bookkeeper, Mr. Geddes was on good terms. Mr. Geddes did not therefore go to the furnace or ask to examine the books. No objection was made to his examining them, but he preferred to ask for a balance sheet through Mr. Shriner, and on the 10th of February 1864, he addressed a letter to Dr. Rooke, in which he requested him to furnish a balance sheet of the business at the furnace. To this letter Dr. Rooke replied by the letter of February 11th 1864. * * * From Dr. Rooke's own testimony this statement did not give a full exhibit of all the property of the Furnace company, real and personal. Mr. Geddes says that he was governed by this letter in making the sale. Dr. Rooke asserts that at the time he made this statement, the idea of buying the interests had not entered his mind, that he was not the bookkeeper and had no charge of the books, and that he found at that time that the books were not posted up, and that there were a good many unsettled accounts which could not be got at. * * * Mr. Geddes states that he knew of a store there, of horses, mules, wagons, carts, boats, &c. (none of which were included in Dr. Rooke's statement), but he did not know their number or value.

This statement was however received by Mr. Geddes, and whatever weight he gave it Mr. Shriner says, that he was not fully satisfied with it, and went down again on the 7th day of March 1864, to see if they had a statement. At that time, he states that Dr. Rooke asked him if he had seen the statement sent to Mr. Geddes; also, stating that they were very busy and had not time to make out a regular balance sheet, but that the statement to Mr. Geddes could be relied upon. Mr. Shriner then tells Dr. Rooke that he had seen it, but that it was not satisfactory to him, that he would never sell out on such a showing as that unless he was forced to, and that at the same time, it was not his wish to sell out at present on any terms. At the interview March 1st 1864 Peter Beaver and Dr. Rooke named either $25,000 or $26,000 as the price they would be willing to give for the Geddes and Shriner interests, and it was understood that if Mr. Kremer could succeed in purchasing them for less he was to have the difference. They separated with that understanding, and Kremer started to see Mr. Shriner. He had a conversation with him the same day at Mr. Shriner's own house, and was led to think, from the talk, that he could buy the interests for $24,000. He so reported to Peter Beaver, and * * * he had nothing further to do with it. Mr. Kremer afterwards wished an interest in the furnace. This, it appears, was agreed to be given him by some, but refused by others. In June 1864, he stated to Dr. Rooke that the partners could afford to give him an extra $1000; that he could have made that much if Mr. Peter Beaver had not interfered with his buying the Geddes and Shriner interests. The $1000 was paid him. Mr. Kremer states he received the money and Dr. Rooke says he acceded to the request made by Mr. Kremer, that he would pay $250 of the $1000.

"The negotiations appear to have occupied weeks, beginning about February 1st, and terminating in the execution of the deeds, April 2d 1864. It was only a short time after Mr. Geddes agreed to the terms of purchase that the deeds were made. * * * Mr. Shriner was more reluctant to sell, although Mr. Kremer states that Mr. Shriner spoke to him several times about buying his interests. Mr. Wolfe says he recollects making it his business to see Mr. Shriner about this sale, and may have made use of arguments to induce him to sell. Mr. Geddes told Wolfe that Shriner must sell, so he could get clear of his interest. Mr. Shriner regarded the prospects for the iron business as flattering, but stated to James S. Marsh that if he did not sell when the business was good, he could not sell at all. He also says that, from what Mr. Wolfe told him, he was afraid the furnace might be put up at a forced sale and be sacrificed. Mr. Shriner * * * considered that he ought to have better terms than Mr. Geddes, from the fact that he had worked at the furnace, took an interest in it, and helped it

along, while Mr. Geddes had done nothing, and wanted Mr. Marsh to interest himself in getting him an allowance that would make him whole; he thought an additional $2000 to him would make him whole. * * * Mr. Marsh * * * went down to the furnace and saw Dr. Rooke and Peter Beaver, and laid the matter before them. There it was agreed that Mr. Shriner's wishes might be acceded to. He saw Thomas Beaver, and it was arranged that .Mr. Shriner should get the extra $2000. Mr. Shriner agreed to a sale of the interests about the 28th of March 1864, and by his request this $2000 item was to be kept from the knowledge of Mr. Geddes, for the reason that Shriner being largely indebted to Geddes and Marsh, under these circumstances Mr. Shriner would not be able to get the $2000 into his possession, but Mr. Geddes would insist on having it.

" After the terms had been arranged, the memorandum (A.) heretofore given, was made by Thomas Beaver, without the knowledge of either Geddes or Shriner.

"The deeds from Shriner and Geddes respectively, were made to Beaver April 2d 1864; the consideration, including the $2000 extra paid to Shriner, being $27,775.51.

"After the delivery of the deeds Shriner and the two Beavers went to Peter Beaver's store; Peter there paid Thomas $2000, and he paid it to Shriner as his extra compensation; it was there that Shriner had the first intimation that the purchase was for his partners. On the same day entries were made on the books of Beaver, Geddes, Marsh & Co., in accordance with the paper (B.) dated April 2d 1864, heretofore given. The partners had some negotiations before they could arrange the purchase from Shriner and Geddes amongst themselves; the matter was finally adjusted by the agreement of June 1864, heretofore stated. On the 30th of December 1865, Thomas Beaver, for the consideration of $25,000, conveyed his interest in the furnace to James S. Marsh, Peter Beaver and Levi Rooke, trading as Beaver, Marsh & Co.

* * * " Throughout this transaction, up to April 2d 1864, Mr. Jonathan Wolfe acted as the agent of Mr. Geddes, and conducted the negotiations on the part of Mr. Geddes, on the basis of a sale of his and Mr. Shriner's interests to Thomas Beaver. It is alleged by respondents that the reason they got Thomas Beaver to buy was because the vendors would be better satisfied with the paper of Thomas Beaver; but be this as it may, there is no evidence that any reason of this kind was ever communicated either to Mr. Wolfe, Mr. Geddes or Mr. Shriner. As has been before stated, they sold to Thomas Beaver, and there was nothing to indicate a sale to their co-partners until the 2d of April 1864, when, after the deeds were made and delivered, Joseph W. Shriner became aware, as he states, that Thomas Beaver was not buying for himself. At the time the deeds were made Mr. Geddes and Mr. Shriner appeared

[Geddes's Appeal.]

satisfied with the transaction.    This seems to have been especially
the case with Mr. Geddes, who, as Mr. Wolfe expresses it, seemed
satisfied and felt relieved."

The master in stating his opinion said :—

* * * "There is nothing to indicate that either Mr. Geddes or
Mr. Shriner knew that they were selling to their partners, or to
any one of them, but they thought they were dealing exclusively
with Thomas Beaver.    These being the facts in this transaction,
did these parties hold such relations of trust and confidence to-
wards each other, by reason of the co-partnership, as will call for
the application of the rules relating to *trustee* and *cestui que trust*,
and especially when a third party has been interposed by one part-
ner or set of partners to buy out the interests of his or their co-
partners ?    This is the question which meets us at the threshold of
this case, and must be disposed of before going into the subject of
actual fraud."

The master then examined and discussed very many authorities.

* * * " From his consideration of this subject, the master con-
cludes, that in the case of partner and partner, untrammelled by
special circumstances, the purchase of one partner's interest by
another, is not sufficient to call for an application of the rules
relative to *trustee* and *cestui que trust*, or to render the con-
tract either void or voidable.    But it is contended that another in-
gredient entered into this transaction which had the effect of ren-
dering it constructively fraudulent, to wit : The procurement of a
third party (Thomas Beaver) to purchase the interests of the plain-
tiffs in the firm in behalf of their co-partners.  * * *  He would
further conclude that unless it is shown that by the intervention
of a third person, by the buyer, an unfair advantage was taken of
the selling partner, the intervention would be immaterial, and the
contract would not be void or voidable, *per interpositionem personæ*.
In the opinion of the master, therefore, this transaction was not
against the policy of the law or constructively fraudulent. * * *

" Has there been undue advantage taken of the plaintiffs by
defendants ?    Has there been any misrepresentation or any con-
cealment of material facts, or any just suspicion of artifice or undue
influence ?    Or have the defendants, or any of them, in the exclusive
superintendence of the business and accounts of the Union Fur-
nace, by concealment of the true state of accounts and business,
purchased the shares of the plaintiffs at an inadequate price by
means of such concealment ?    Or has there been any other fraudu-
lent imposition or contrivance by or through which the plaintiffs
have been defrauded of their interests in the furnace property ?

" The matter which would first of all be likely to arrest atten-
tion in this transaction is the interposition of Thomas Beaver as a
purchaser. * * * It must be shown to be attended with fraud
upon the plaintiffs, and damage to their interests, in order to vitiate

the sale, and unless this were the case, then was the interposition an altogether immaterial matter, such an arrangement unnecessary, and the parties might as·well have dealt with each other face to face. There is no evidence that by this intervention there was any undue advantage taken. It may be urged, that had a partner been purchasing, and had the parties been dealing with each other, face to face, the business matters at the furnace would have been more thoroughly overhauled, and the suspicions of the plaintiffs awakened to the possibility that their interests were worth more than they were led to believe; but even this theory loses most of its force when we consider who it was that was brought forward as the nominal purchaser. Thomas Beaver had been in the firm from the start, he knew all about the business and had not been out of the concern a year when these negotiations were set on foot. His brother Peter was in the firm. He himself resided at Danville, some fifteen miles distant, and was largely engaged in the iron business, having business relations and constant communication with Union Furnace. When it is represented to the plaintiffs that Thomas Beaver is willing and ready to buy their interests, would this not have as great an effect upon the plaintiffs in causing them to measure and carefully weigh their interests before parting with them as though any one of their co-partners had openly proposed terms of purchase?

"Again, in reference to the control and management of the furnace, the evidence is that there was no *exclusive* control and management thereof by any partner or partners. * * * The avenues to correct information were not therefore closed to the plaintiffs by reason of any exclusive control or management on the part of any of the defendants, and it has been laid down that, even in case of false misrepresentations, these will not be considered fraudulent, 'when both parties have equal means of information, so that by the exercise of ordinary prudence and diligence either may rely upon his own judgment.' * * *

"But the plaintiffs aver that in an especial manner the letter and statement of Dr. Rooke, of February 11th 1864, were a misrepresentation, and that being thereby governed in the estimation of the value and the sale of their interests, they were thus defrauded. * * * The master cannot see in this a letter written for the purpose of misrepresentation or concealment, or to perpetrate a fraud upon a co-partner. There is an .expressed desire and willingness to have the plaintiffs look at the matter for themselves, and a statement that the estimate might be wrong a thousand dollars or so would be to any business man a direct intimation of the looseness with which the estimate was made. * * * The books show the value of the plaintiffs' interests on April 1st 1864, that is, investment and interest, as $33,833.37. The amount paid for the interests, including the $2000 paid extra to Mr. Shriner, was $27,785. There is

[Geddes's Appeal.]

nothing here which would show that gross inadequacy of price which calls for relief; and when we consider the estimated value of these interests as they found the subject-matter of negotiation about February 1st 1864, we cannot fairly look at the matter from our present standpoint, but must put ourselves in the position of the parties as they stood at that date.  The question is, 'whether, under the circumstances existing at the time, there was any misleading, or any designed withholding of a more full disclosure for the purpose of bringing about a bargain unfair and unequal, in which the advantage was to be on one side.'  The iron business had not been a successful one, but at the period of these negotiations it was looking up, and that fact was known to all the co-partners.  It was also known to all of them that the business was a fluctuating one; sometimes prosperous, sometimes depressed.  The amount of capital required was large and the risks great, and no one able to look into the future and say what the result might be. Taking into consideration all of the existing circumstances, including the business abilities of all the co-partners, and the means of information which they had at hand, the master is unable to find that the statements, as made by the defendants, or any of them, through Jonathan Wolfe, were false and fraudulent, and made for the purpose of inducing the plaintiffs to sell their interests in the firm for less than the same were really worth. * * * It was Mr. Shriner who requested this matter to be kept from the knowledge of Mr. Geddes, for the reason that otherwise Mr. Geddes would have obtained the money; he is further led to the conclusion, that if there is any fraud growing out of these facts or contained in them, the injury is one inflicted by Mr. Shriner upon Mr. Geddes, rather than by the defendants upon the plaintiffs. And as to its preventing a full and free communication between Mr. Geddes and Mr. Shriner, the master finds that this transaction was one entered into very late in the progress of negotiations, at its very winding up, on or about the 28th of March 1864.  Whereas, for some two months at least previously, there was ample scope for communication between these parties, and as far as time was essential, there was a sufficient period in which to have gained a full and complete knowledge of their respective interests. * * *

" There is no evidence that Kremer, the bookkeeper, ever refused to give any information which he had at command concerning the books or business to any of the partners, or that the failure to get out a balance sheet sprung from any agreement made between Kremer and the defendants.  He endeavored to get an interest in Union Furnace, after having first thought of acquiring an interest in Beaver Furnace, but there is no evidence whatever going to show that he was promised such interest in consideration of any concealment or misrepresentation affecting the plaintiff's interest and estate." * * *

The master reported finally that the bill should be dismissed.

The plaintiff filed exceptions to the master's report.

The court, Junkin, P. J., of Forty-first district, overruled the exceptions and confirmed the report, and decreed that the bill be dismissed with costs.

The plaintiff appealed to the Supreme Court, and in a number of specifications, assigned the decree for error.

*A. H. Dill* and *J. M. Linn*, for appellant.—The confidential relation between partners forbids that in their dealing either should use his superior information to the disadvantage of the other: 1 Story Eq. Jur., sect. 220–323. The technical relation of trustee and cestui que trust need not exist: Fox *v.* Mackreth, 2 Brown's C. C. 400; 1 Leading Cases in Eq. 105, and notes 126; Leisenring *v.* Black, 5 Watts 303; Michoud *v.* Girod, 4 Howard 503; Brooks *v.* Martin, 2 Wall. 70; Coles *v.* Trecothick, 9 Ves. 234; Teakle *v.* Bailey, 2 Brockenbrough 51; Hunter *v.* Atkyns, 3 Myl. & K. 113; Maddeford *v.* Austwick, 1 Sim. 89.

*G. F. Miller*, for appellees.—A sale to a trustee being voidable only, proceedings to set it aside must be commenced within a reasonable time: Jackson *v.* Welsh, 14 Johns. Rep. 408; Farnam *v.* Brooks, 9 Pick. 234. The purchase by a trustee through a secret agent does not make a sale void: Beeson *v.* Beeson, 9 Barr 280. Whilst as between trustee and cestui que trust no length of time bars a direct trust, it is not so with a constructive trust: Campbell *v.* Walker, 5 Ves. 678; Hawley *v.* Kramer, 4 Cowen 718; Prevost *v.* Gratz, 1 Peters's C. C. Rep. 368; Clegg *v.* Edmundson, 3 Jur. N. S. 299; Beckford *v.* Wade, 17 Ves. 87; Leeds *v.* Amherst, 2 Phillips 123; Jordan *v.* Money, 5 H. L. C. 185; Selvey *v.* Rhoads, 1 Bligh. N. S. 1; Chalmer *v.* Bradley, 1 Jac. & Walker 59. Equity will not assist one who is capable of taking care of himself: 1 Story's Eq. Jur., sect. 241; Eichelberger *v.* Barnitz, 1 Yeates 307. Inadequacy of price alone is not ground for relief: Cummings's Appeal, 17 P. F. Smith 404; Duvall *v.* Coale, 1 Maryland Ch. Decis. 168; Caldwell *v.* Boyd, 7 P. F. Smith 325; Davidson *v.* Little, 10 Harris 251; Graham *v.* Pancoast, 6 Casey 89. Misrepresentation as to value is not ground for relief when there is no fiduciary relation: Nace *v.* Boyer, 6 Casey 99; Rockafellow *v.* Baker, 5 Wright 319.

Mr. Justice PAXSON delivered the opinion of the court, May 8th 1876.

The appellant and Joseph W. Shriner, the appellant in Shriner's Appeal, argued with this case, were part-owners of the Union Furnace. The furnace was erected in 1853, and from that time down to the 1st of April 1864 was operated and owned by firms of which Geddes and Shriner were members. On the 1st of April

1864 a sale was made by Geddes and Shriner of their interest in said furnace to Thomas Beaver, for the sum of $25,775.51. Shriner was paid $2000 extra; so that the whole amount of the purchase-money was $27,775.51. Six years, lacking a few days, after this sale, Geddes and Shriner respectively filed their bills in equity against their late co-partners, alleging, inter alia, that they had discovered, since the sale that the furnace was in a prosperous condition on the 1st day of April 1864, and making large profits; that it had made before that time about $100,000, the amount originally invested, which was profit; that the real estate and fixtures had greatly enhanced in value; all of which was unknown to and concealed from them. They also alleged that Thomas Beaver did not purchase for himself, but for the defendants, James S. Marsh, Peter Beaver and Levi Rooke, which fact was unknown to Geddes and Shriner at the time, and was studiously concealed from them; that they were led to believe by the assertions of their co-partners, or some of them, that no profits had been realized or money made by the firm; and that the furnace was not worth the original investment and interest. They therefore prayed relief, the object of the bills respectively being to set aside the sale of the Union Furnace, and that the deeds executed to Thomas Beaver might be declared fraudulent and void as an absolute conveyance. The master found against the plaintiffs upon the question of fraud, and dismissed their bills. The court below sustained the finding of the master and dismissed the exceptions. An appeal to this court was entered by the plaintiff in each case. In Geddes's Appeal there are six assignments of error, which will be considered in their order.

The first, second and third assignments are to the finding of the facts by the master. I have examined the voluminous testimony in the case with great care, and am unable to say that the master's finding of the facts is not fully sustained. If, as stated in the first assignment, the testimony was equally balanced, it cannot be said that his finding is necessarily erroneous. With a single witness on a side, and an assertion of a fact by the one and a denial by the other, the master may nevertheless find the fact. He may believe the one witness and discredit the other. This occurs almost daily in trials by jury. Applying to each witness the tests which the law recognises, the master, who was also examiner, may be able to say which speaks the truth, or which is mistaken. The mere manner of the witness may indicate this. But in such case we have no such test, and must accept the finding of the master. With us it would be the merest guess.

The second assignment refers to a number of distinct questions of fact, the most important of which are the concealment from the plaintiff that Thomas Beaver purchased for the defendants, partners in the firm with plaintiff, and that plaintiff's interest in the

furnace was purchased for several thousand dollars less than it was worth. In regard to the first it is sufficient to say that the master, in his report upon the exceptions, finds the fact to be that it was concealed from the plaintiff that Beaver was buying for the other partners. Of this finding the plaintiff cannot complain. It is in his favor for whatever it is worth. The second ground of objection is not sustained by the evidence. The other matters referred to in this assignment are of minor importance. It was no fraud upon Geddes that Shriner received $2000, or any other sum more than he did, provided he (Geddes) received the value of his interest. A man has no legal right to complain that another has received a higher price for property of similar value.

The third assignment alleges error in ruling that the interposition of Thomas Beaver to purchase for defendants was not in itself such an undue concealment as avoided the transaction at the option of the complainant. It is not too much to say that very much of the atmosphere of fraud which has been ingeniously thrown around this case is due to the circumstance of the admitted concealment of the fact that Thomas Beaver was not buying for himself, but for the other partners of the firm. That such a concealment was not a fraud *per se,* as is assumed in this assignment of error, is easily demonstrated. Of what importance was it to the plaintiff who the purchaser was, provided he obtained his price, or the value of his interest? It is a very common thing in real estate, and perhaps other transactions, for the purchaser to conceal his name from the vendor, and negotiate through or in the name of another party. The reasons for this are obvious, and such course of dealing has never been held to be fraudulent. It is true there might be a case in which such concealment might be some evidence of fraud. But it would only be so in its relation to other facts, as to which it formed a connecting link in a chain of evidence to establish a fraud, where a fraud in fact had been committed. In this case we have the fact in proof that the relations between the plaintiff and his partners were not of the most amicable kind. This circumstance may have induced the latter to conceal their real purpose. It is said that if the plaintiff had known who the actual purchasers were, it would have put him upon his guard, and perhaps induced him to demand a higher price for his interest. This, if true, raises no equity. The argument, to be worth anything, must go the extent of supposing that the plaintiff would have used the information for the purpose of exacting a greater price than his interest was worth. For if he got its value, how was he injured? It is possible the defendants had this in view in withholding the information from him. They had a right to buy upon as good terms as they could, provided they did no wrong to the plaintiff. It is difficult to see why the fact that Thomas Beaver desired to purchase the plaintiff's interest was not equally as sig-

nificant as a purchase direct by the defendants.  Mr. Beaver had gone out of the firm only the year before.  He had sold out at a heavy sacrifice.  He was reputed to be a wealthy and shrewd iron master.  That such a person desired to come back into the firm would seem quite as suggestive of rising values as that the other partners desired to buy.

The fourth assignment raises the really important question in this cause.  Was there such a fraud in this transaction as would avoid the sale ?  He who alleges fraud must prove it.  And the proof must be clear and satisfactory to induce a court of equity, after the expiration of nearly six years, to avoid a contract which was deliberately made, and has been fully executed.

This furnace was established in 1853.  It had made no money prior to 1863.  During that year Thomas Beaver sold out his interest at a sacrifice of about one-half.  Some years before the plaintiff had tried to sell to Peter Beaver, but without success. There is no class of real property more difficult to dispose of than an undivided interest in an iron furnace.  The iron business is one in which fortunes are sometimes made rapidly, and as suddenly disappear.  It is eminently precarious, subject to frequent and violent fluctuations.  At the close of ten years of dull times the plaintiff had on hand as unsaleable a piece of property as could be found in the state ; yet at the time he sold the tide had turned. He knew this, and was advised not to sell, but very naturally reasoned that if he did not do so when the business was improving he could not sell at all.  In 1863 the firm made some money, so that on January 1st 1864 there was a balance in favor of the furnace of $12,000.  Up to April 1st 1864 there was made the further sum of $16,499.67.  On that day the value of the Geddes and Shriner interests, as found by the master, was $33,833.37.  This included interest, which had never been earned, on the investment. The amount paid for these interests was $27,785.  We cannot say that this was an inadequate price.  We have no reason to suppose any one else would have given more.  There is no evidence that any other purchaser could have been obtained who would have given as much.  That the business was prosperous, enabling the parties to make large profits, and to pay for the shares out of the profits, is not to the purpose.  We are not to judge this transaction by the light of subsequent events.  It was consummated in the face of an uncertain future.  The ebb and flow of the business tide in that future was concealed from human vision.  Had the defendants been stranded amid its breakers, this bill probably would not have been filed.

Given an adequate consideration, and the whole theory of fraud in this case crumbles.  It is unnecessary to go over the allegations of concealment and misrepresentation in detail.  In the absence of inadequacy of consideration they are not especially significant.

Much importance was attached, however, to the letter of Levi Rooke, of February 11th 1864, inasmuch as it is alleged that it grossly misrepresented the value of the property, and induced the plaintiff to sell. It is sufficient to say, in regard to it, that it does not profess to be full and accurate. It refers to the sickness of the bookkeeper, and his consequent inability to make out a balance sheet. It closes with a request to Mr. Geddes, to come down and see for himself as soon as the bookkeeper got better. Surely if Mr. Geddes was deceived by this letter it was his own fault. He was selling his own property. He had the fullest access to the books. Those books were his books; they belonged to the firm of which he was a member. No one ever denied him access to them, and it is not even alleged that they contained any false entries. It is not to the purpose that he did not understand them. He could have obtained the services of an expert in case he failed to obtain the information from the bookkeeper. He had the means of information, and it was his duty to have availed himself thereof. He cannot charge any one else with the consequences, whatever they may be, of his own neglect. The remark of Mr. Justice WOODWARD, in Rockafellow *v.* Baker, 5 Wright 319, is applicable here: " But there is neither fraud nor mistake, in the legal sense of those terms, when the buyer of an article, which he finds in market, has a full opportunity to examine it, and when the means of information, relative to facts and circumstances affecting the value of the commodity, are equally accessible to both parties."

It is to be remembered that the parties are not before us upon a bill seeking specific performance. The contract was fully executed several years ago. We are now asked to undo all this, and remit the parties to their position before the sale. A court of equity should move with cautious and reluctant steps upon such a path as this, for it is a very narrow one. Nothing but fraud or palpable mistake is ground for rescinding an executed contract: Rockafellow *v.* Baker, 5 Wright 319 ; Graham *v.* Pancoast, 6 Casey 97 ; Nace *v.* Boyer, Id. 109. Mistake is not alleged. The plaintiff has shown no such clear fraud as would justify us at this late day in disturbing this transaction.

Decree affirmed, with costs to be paid by appellant, and appeal dismissed.